O

JS - 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRUSTEES OF THE SOUTHERN CALIFORNIA IBEW-NECA PENSION PLAN,<br><br>                Plaintiff,<br><br>v.<br><br>RICHARD RIOS, an individual<br><br>                Defendant.<br><br>_____ | CASE NO. EDCV 07-1085 SGL (JCR)x<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

      This matter is before the Court on administrative review.

      Plaintiff Trustees of the Southern California IBEW-NECA Pension Plan ("Trustees") is a labor-management multi-employer trust, and is subject to the requirements of the Employee Retirement Income Security Act of 1974 ("ERISA"). Defendant Richard Rios ("Rios") began receiving early retirement pension benefits from the Trustees in October, 1994.

      In June, 2005, the Trustees suspended Rios's benefits when his post-retirement employment was determined "suspendible" and "nonunion."

      The Trustees have now brought suit against Rios to recover $41,899.88 in overpaid pension benefits from August, 2003 through May, 2005. The Court has reviewed the parties' briefs and the administrative record. Having now carefully considered the full record and arguments of the parties, the Court finds and

concludes as follows:

## I. The Policy

The Southern California IBEW-NECA Pension Plan ("Plan") is a pension fund created by agreement between southern California employers in the electrical contracting industry, certain chapters of the National Electrical Contractors Association in Southern California, and various local electrical unions (including International Brotherhood of Electrical Workers Local Union No. 11). Administrative Record ("AR") 59-60. As part of the agreement, the employers are required to contribute to the pension fund on behalf of their employees represented by the union. AR 59-60. When these employees retire, they become eligible to receive from the fund a monthly pension benefit. AR 45, 50-51.

Like most employee pension funds, the Plan is subject to the requirements of ERISA. AR 62-63. Under ERISA, pension plans must provide that "an employee's right to his normal retirement benefit is non-forfeitable upon the attainment of normal retirement age." 29 U.S.C. § 1053(a). Consistent with this requirement, however, multi-employer plans may condition benefits on an employee's promise not to engage in certain kinds of employment after retirement. If a retiree returns to work "in the same industry, in the same trade or craft, and the same geographic area covered by the plan," ERISA allows the retiree's benefits to be suspended for as long as he remains in that employment. *Id.* §1053(a)(3)(B)(ii).

Incorporating these terms, and with respect to early retirement, the Plan provides: "Suspendible employment means work in the electrical construction contracting industry, in the same geographic area that was covered by the Plan when the Pensioner's benefits commenced, in the same trade or craft in which the Pensioner worked at any time in Covered Employment." AR 101.

In addition, to be eligible for early retirement under the Plan, the participant must refrain from both suspendible employment, and "nonunion employment." AR 101-103.

Accordingly, the Plan requires all participants receiving pension benefits to report any employment in the electrical construction contracting industry to the Trustees. AR 57, 103. The Trustees, who administer the Plan, are comprised of an equal number of employer (also known as "management") trustees and employee (also known as "labor") trustees.[1] AR 59. The Trustees determine whether the work reported by participants is suspendible or nonunion, and given that determination, whether pension benefits may continue to the participant. AR 103-104. Under the Plan, the Trustees also have the right to recover any overpayment of pension benefits. AR 103-104.

## II. Statement of Facts

Rios became a member of the International Brotherhood of Electrical Workers ("IBEW") Local Union No. 11 and a participant in the Plan in 1975. Declaration of Richard Rios ("Rios Decl.) ¶ 4. He became eligible for early retirement in September, 1994. Rios Decl. ¶ 4. In July, 1993, Rios received a written memorandum from the administrative office of the Plan that explained his pension benefits would not begin unless he submitted a written request to work after retirement, or explicitly stated he did not intend to work in any capacity after retirement. AR 117-118, Declaration of Richard Goldberg ("Goldberg Decl.") ¶ 8, Rios Decl. ¶ 5-6. Accordingly, when Rios decided to retire early in September, 1994, he submitted a written request for permission to work as a "sales leader" marketing life and disability insurance. AR 117-118, Goldberg Decl. ¶ 8, Rios Decl. ¶ 5-6.

### Rios's Pension Benefits Begin

In October, 1994, the pension department of the Plan informed Rios that his request to work as a sales leader had been approved, and reminded him that if he decided to change jobs or seek other employment, he "must notify the Pension Plan immediately." AR 121. In that same month, Rios began receiving early retirement pension benefits in the amount of $1904.54 per month, at which point he was again

---

[1] The Plan also employs salaried administrative personnel. AR 59.

reminded to notify the Trustees of any change in employment in order to prevent incorrect payments.  AR 122, Rios Decl. ¶ 5-6, Goldberg Decl. ¶ 9.

Rios did not communicate with the Trustees again until October 20, 1997, when he faxed a letter to the pension department indicating his interest in two positions at two different companies.  AR 123-126.  Rios attached two items to his letter:  (1) A company description of Aidco, a telecommunications company whose services included "cabling systems installation and maintenance," and (2) a job advertisement, apparently from Claremont University, in which the only legible words read "new today" and "low voltage." AR 123-126.

On October 29, 1997, an assistant administrator of the Plan sent Rios a letter that asked for more information from Rios regarding the geographical scope of the Aidco position and also stated that the Claremont University job posting was illegible when transmitted by facsimile.  AR 127.  There is no record of any further correspondence from Rios regarding either job position.  Goldberg Decl. ¶ 14.  However, Rios testified in July, 2005 that he had worked at Aidco from October, 1997 to July, 2001.  AR 17-18, Rios Decl.  ¶ 8.  Rios also testified that he thought the Trustees were aware of his employment with Aidco.  AR 17-18, Rios Decl. ¶ 8.

**Rios's Employment at Coast Security**

On July 14, 2003, Rios received an employment verification form entitled "Certification of Pensioner For Work Performed," which asked him to provide a description of any employment in which he had engaged from July, 2002, through July, 2003.  AR 128-129.  Rios completed the form, stating that he had been employed since 2001 as a lead technician at Coast Security, Incorporated ("Coast Security").  AR 128-129.

A few months later, on November 7, 2003, the pension department sent a follow-up letter to Rios asking for additional information about his employment at Coast Security, such as a description of his job duties and confirmation of his dates of employment.  AR 130.  The letter also stated that Rios's pension file did not

4

contain a "request for work" form for the Coast Security position, and instructed Rios to submit a request for work immediately if he had not already done so. AR 130.

On December 12, 2003, the pension department sent Rios another letter asking for the same. AR 131. In January, 2004, Tim Todisco, Rios's supervisor at Coast Security, mailed a letter to the Trustees that verified Rios had been employed with Coast Security since July 28, 2001, and that his duties included installing low voltage cables. AR 132, Goldberg Decl. ¶ 17, Rios Decl. ¶ 11.

In May, 2004, Richard Goldberg, manager of the pension department, and Douglas Chappell, a labor Trustee, shared correspondence about whether Rios's employment at Coast Security was "suspendible" as Coast Security was a nonunion employer that held a C-10 license. Goldberg Decl. ¶18, Declaration of Douglas Chappell ("Chappell Decl.") ¶ 4, AR 134-135. Goldberg requested that the Trustees determine whether Rios's employment was suspendible at their next meeting, to be held March 24, 2005.

On March 24, 2005, the Trustees determined that Rios's employment at Coast Security was both suspendible and nonunion. Goldberg Decl. ¶ 21, AR 139-140. On May 4, 2005, Richard Goldberg sent Rios a letter informing him of the Trustees' determination and that, as a result, Rios had been overpaid pension benefits from October, 1994, through May, 2005, for a total amount of $198,614.18. AR 139-140. Rios's benefits were suspended beginning June, 2005. AR 139-140, Rios Decl. ¶ 14.

On May 17, 2005, Rios sent Mr. Goldberg a letter expressing his disappointment in the Trustees' determination and requesting an in-person appeal hearing. AR 141, Goldberg Decl. ¶ 22-25, Rios Decl. ¶14. On May 23, 2005, Mr. Goldberg sent Rios a responding letter that explained Rios would soon receive a copy of his administrative file, upon which the appeal hearing would be based, and that if there were any additional documents that Rios wanted to include, he should provide copies of those documents, if any, to the committee before the hearing. AR 142.

Meanwhile, on June 21, 2005, Mr. Goldberg sent Rios a letter correcting the $198,614.18 amount that Rios apparently owed. AR 143. Instead, the revised amount owed was $158,553.73. AR 143.

## Rios's Appeal

Rios's appeal hearing occurred on July 20, 2005. AR 9-31. Rios represented himself and brought one witness, Tim Todisco, who is the general manager of Coast Security. The other individuals present at the hearing were chairman of the Benefit Appeals Subcommittee and management trustee Stephen Brown, labor trustee Douglas Chappell, manager of the Plan's pension department Richard Goldberg, and trust counsel Melissa Cook.[2]

When the hearing began, Rios verified that documents had been sent to him from the pension department in preparation for the hearing. AR 14. Rios also stipulated that there were no other written documents upon which he wanted the hearing to be based, and that if he did have any additional documents he would provide them to the committee. AR 14-15.

Rios further testified that, when he elected early retirement, he never intended to work in the electrical field again, but that at Coast Security, he "started to do low voltage cameras and security systems." AR 15. Nevertheless, Rios contended that he has never done any kind of work that "has taken away from the IBEW," though he did admit that some of his present work – "pulling cable stuff like that" – is the same as work he did before retirement. AR 15-16. When describing Rios's duties at Coast Security, Rios's supervisor, Tim Todisco stated, "99 percent of the time he [Rios] is doing a CCTV [Closed Circuit Television] project, putting in cameras and running the low voltage, setting up the controls in the control room." AR 25.

Rios argued that he was being told that his present work is suspendible "on technicalities ... which is kind of vague as far as I am concerned." AR 16. Douglas Chappell, the labor trustee, explained to Rios that if he performed a different type of

---

[2] Joy Evans, a certified reporter, was also present and recorded the hearing.

electrical work after retirement than he did before retirement, Rios would still "... be in trouble ... you may have never done it when you were in the electrical trade but ... it doesn't mean it's not work being done by union signatory contractors." AR 21.

    Rios also declared he was never questioned about doing low voltage work until relatively recently, and testified that he "has been doing this low voltage work now for six years, almost eight years" and that "nothing was ever sent to me from the pension department." AR 16. When asked whether he notified the Plan when he left Aidco to work for Coast Security, Rios answered, "I am pretty sure that I called somebody but I didn't write anything." AR 19. Rios admitted that the only written document he sent in regarding his work at Coast Security was the July, 2003, employment verification form, but that "verbally I may have called somebody." AR 17-18, AR 129. Rios could not recollect whether he received approval to begin working at Coast Security. AR 20.

    When asked by Doug Chappell whether Coast Security competed against union contract companies, Todisco testified, "None not that I know of." Douglas Chappell replied that there was a "whole list" of security companies such as Coast Security that were in fact union contract companies. AR 22. Todisco also admitted Coast Security held a C-10 license. AR 24-25.

    Trust counsel Melissa Cook advised Rios that the committee would make a recommendation to the Trustees who would then issue a determination. AR 30-31. Rios asked about the "next step," at which point he was advised that if he did not agree with the Trustees' determination, he had the right to pursue the matter in arbitration or court or both. AR 30-31.

    On September 25, 2005, Mr. Goldberg sent Rios the "Findings and Recommendation" of the committee, along with a letter that informed Rios his appeal had been denied. AR 146-149. However, upon the recommendation of the committee, the amount Rios owed was decreased from $158,553.73 to $41,988.88, as the Trustees had decided to suspend benefits prospectively – following the receipt

of employment certification from the pensioner. AR 149. Rios's employment certification with Coast Security was received July 15, 2003, thus his benefits were deemed to be suspended August, 2003. AR 149. As such, Rios owed $1904.54 per month for 22 months, from August, 2003, until May 2005, for a total of $41,988.88. AR 146-149.

### The Present Litigation

The Trustees filed the instant lawsuit against Rios on August 27, 2007. Declaration of Jacqueline Norlin ("Norlin Decl.") ¶ 3. The First Amended Complaint alleges the following causes of action: (1) Breach of ERISA fiduciary duties; (2) misappropriation of trust assets; (3) conversion; (4) fraud; and (5) restitution for unjust enrichment.

### III. Standard of Review

The parties agree that an abuse of discretion standard applies to the Court's review of the Trustees' determination. Pl. Trial Br. at 7, Def. Reply at 8. However, Rios alleges the Trustees have a conflict of interest because they "have an obvious and irrefutable interest in not paying out funds through the Plan." Def. Reply, at p. 13.

Where an entity both determines eligibility for benefits and pays benefits awards, the court must weigh this so-called "structural conflict of interest" as a factor in determining whether there was an abuse of discretion. Nolan v. Heald College, 551 F.3d 1148, 1153 (9th Cir. 2009), citing Metropolitan Life Ins. Co. v. Glenn, — U.S. —, 128 S.Ct. 2343 (2008). Even if a conflict of interest exists, its significance in determining how much deference to afford the entity's decision depends on the "nature, extent, and effect" the alleged conflict actually had on the entity's decision-making process. Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 970. The conflict of interest is only one of "several different considerations" the Court is to take into account when evaluating the entity's decision, Glenn, 128 S.Ct. at 2351. The court is "to temper the abuse of discretion standard with skepticism 'commensurate'

with the conflict." Nolan, 551 F.3d at 1153. At bottom, even after Glenn and even where a conflict exists, the question is not whether the Court would have approved the claim for benefits. Rather, as the Seventh Circuit has recently explained, "[w]hen the case is borderline . . . the inherent conflict of interest that exists in so many of these situations can push it over the edge-towards a finding of capriciousness." Jenkins v. Price Waterhouse Long Term Disability Plan, 564 F.3d 856, 861-62 (7th Cir. 2009).

## IV. CONCLUSIONS OF LAW

### A. There is no conflict of interest in the instant case.

Rios makes two arguments regarding the existence of a conflict of interest, and that, because of this conflict, the Trustees' determination should be abandoned as "self-serving." Def. Rep. Br. 13. First, the Trustees allegedly have an interest in "not paying out" Plan funds. Def. Rep. Br. 13. Defense counsel further alleged the Trustees have "a very incestuous relationship." Bench Trial Transcript ("Transcript"), 13:21. Second, Rios declared the Trustees excluded information from the administrative record that would have resulted in a favorable determination for Rios (such as telephone logs and the sworn testimony of Rios and Mr. Todisco), and that such an exclusion demonstrates the Trustees' conflict of interest. Def. Rep. Br. 2-3, 11-12, Transcript 15:12-17:14. Neither argument is persuasive.

Beyond a conclusory assertion, Rios has failed to demonstrate the existence of a structural conflict of interest that must be considered by this Court in reviewing the benefits decision. Unlike Glenn and other cases involving insurers, the board of Trustees did not in fact both fund and administer the Plan. On the contrary, the Plan's contributors are multiple employers. And those contributions are made according to collective bargaining agreements, which are in turn agreed upon by both management and labor unions. Whether or not Rios, or any other participant of the Plan, is over or underpaid benefits does not affect the amount or nature of the employer contributions into the Plan. Further, defense counsel's "incestuous

relationship" contention lacks basis, as there are as many labor trustees as there are management trustees on the Board. In fact, the Trustees' only job is to administer the Plan, which in turn only has one purpose: To ensure the availability and distribution of monthly benefits to employee-participants. This kind of arrangement does not give rise to a structural conflict of interest.

      Second, Rios contends that the Trustees excluded his testimony and that of his witness, as well as unidentified telephone logs, from the administrative record. Rios would apparently like the Court to surmise this exclusion is demonstrative of the Trustees' conflict of interest. However, neither Rios's testimony, nor that of his witness, was excluded from the administrative record. Rather, both Rios and Todisco testified under oath at the appeal hearing held July 20, 2005. Their testimony is also specifically discussed in the findings and recommendation of the appeal board. Further, the entire hearing transcript was attached as an exhibit in the instant action as part of the administrative record. With regard to the exclusion of telephone call records, Rios testified that he "may have called" and was "pretty sure" that he called the pension department. Accordingly, Rios's alleged phone calls are in fact part of the administrative record because he testified about them. There is no evidence that any independent telephone logs were ever kept by the Trustees. As such, under the circumstances present in the instant case, the lack of telephone logs as part of the administrative record is not demonstrative of a conflict of interest on the part of the Trustees. Finally, at no point did Rio identify any other documents or data that should have been included in the administrative record. Transcript 15:12-17:17.

      Thus, the Court finds that the Trustees do not have a conflict of interest, and were not motivated by any conflict of interest in their determination that Rios was overpaid pension benefits.

### B. The Trustees Did Not Abuse Their Discretion

Rios's arguments that the Trustees abused their discretion, generally fall into two categories: (1) Rios's employment at Coast Security is not in the electrical

contracting industry but rather in a separate niche electronic article surveillance industry, and thus not suspendible or nonunion, and (2) The Trustees' conflict of interest led to their mischaracterization of Rios's employment. Neither argument is persuasive, and the Court concludes the Trustees' decision was adequately supported by the record.

While Rios may sincerely believe his work at Coast Security "does not take away from the brotherhood," the Trustees' determination that his work is in fact suspendible and nonunion is a reasonable determination. The Plan defines suspendible employment as "work in the electrical construction contracting industry, in the same geographic area that was covered by the Plan when the Pensioner's benefits commenced, in the same trade or craft in which the Pensioner worked at any time in Covered Employment," and nonunion employment includes work performed for a company who is doing work in the electrical construction contracting industry but is not contributing to the Plan or a related plan. AR 70.

First, there is no dispute the work Rios performed at Coast Security was in the same geographic area as his work pre-retirement. Second, there is no dispute that Coast Security holds an electrical contractor's licence (C-10 license) and is not a signatory to a collective bargaining agreement or a participant in the Plan or a related plan. Third, Rios admitted he "started to do low voltage cameras and security systems" at Coast Security. Rios also admitted that "pulling cable stuff like that" is the same as what he did prior to retirement. Rios's supervisor also stated that the majority of his work is "putting in cameras and running the low voltage, setting up the controls in the control room." Furthermore, Douglas Chappell, the business manager for International Brotherhood of Electrical Workers, declared that it is the custom and practice in the construction field to describe Rios's work at Coast Security as work in the electrical construction contracting industry, and that the industry includes the installation of EAS (Electronic Article Surveillance] and CCTV [Closed Circuit Television] systems, including installing low voltage cabling, termination, and testing.

All these facts demonstrate that Rios's work at Coast Security was in the same trade or craft, low voltage cabling, as that performed pre-retirement. Accordingly, the Trustees' determination that Rios engaged in suspendible and nonunion employment was reasonable.[3]

There is also ample evidence in the administrative record that Rios did not request permission to work at Coast Security. At the appeal hearing, Rios could not affirmatively state that he requested permission to work at Coast Security. However, the administrative record is laden with letters and reminders to Rios that he was required to request permission to work post-retirement from the Trustees before beginning any subsequent employment. Nevertheless, Rios admitted that the only written document he submitted to the Trustees regarding his employment at Coast Security was in July, 2003, when he replied to the employment verification form that had been sent to him by the Trustees. Rios also could not recollect whether he ever received approval to work at Coast Security and did not have any documentation to that affect. Accordingly, there is nothing in the administrative record (or outside of it) that shows the Trustees were aware of Rios's employment at Coast Security until July, 2003. As such, their determination that he was overpaid pension benefits beginning in August, 2003 is also reasonable.

With regard to the Trustees' alleged conflict of interest resulting in their skewing or coloring the administrative record, the Court has already determined the Trustees did not have a conflict of interest, see section IV (A), *supra*.

**C. The Court Finds in Favor of Plaintiff on Their Fifth Cause of Action for Restitution of the Overpaid Pension Benefits.**

ERISA Section 502(a)(3) authorizes a civil action "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief

---

[3] Rios's contention that he had been engaging in the same type of work at Aidco is irrelevent because the pension benefits he received while working at Aidco are not at issue in the present case.

(i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3) (emphasis added).

Rios argues that the recovery of pension benefits improperly paid to him is not an "equitable" remedy under the statute, and therefore not cognizable by this Court, citing Great-West Life & Annuity Insurance Comp. v. Knudson, 534 U.S. 204 (2002). In Knudson, the Supreme Court defined the scope of relief that is available under § 502(a)(3).  In that case, an insurance company sued an injured driver who was protected by an employee benefit plan. Knudson, 534 U.S. at 207-08.  After the injured driver recovered tort damages from a third party tortfeasor, the plan's insurer sued the plan participant, seeking reimbursement for monies that it had paid out to her for her medical expenses pursuant to the plan. Id.  The insurer's action was brought under ERISA § 502(a)(3); the insurer argued that the plan participant's failure to reimburse it constituted a violation of the plan's terms, and that its claim was "equitable" in nature, in that it involved both an injunction and a claim for restitution. Id. at 210-12.  The Supreme Court disagreed, and affirmed the grant of summary judgment in favor of the defendant, based on its conclusion that the insurer's action was not "equitable" in nature, as it was essentially a claim to compel the defendant to pay a sum of money – that is, a traditional suit at law for damages. Id. at 210.  The Court drew a distinction between legal restitution – "a judgment imposing merely personal liability upon a defendant to pay a sum of money" – and equitable restitution – an action in which the plaintiff seeks to "restore to the plaintiff particular funds or property in the defendant's possession" through the imposition of a constructive trust or an equitable lien. Id. at 213-14, 122 S.Ct. at 714-15 (quotations omitted).

The Supreme Court later clarified the scope of Knudson in Sereboff v. Mid Atlantic Medical Services, Inc.,126 S.Ct. 1869 (2006), by permitting a plaintiff to sue under § 502(a)(3) to enforce a reimbursement provision in a benefit plan on a theory of equitable restitution.  Like Knudson, Sereboff involved a claim by a plan administrator to obtain reimbursement for medical expenses that had been paid out

to the plan beneficiary by a third party tortfeasor. However, in Sereboff, the court emphasized that the funds had been specifically identified; that the funds were still in the defendant's possession; and that it was undisputed that the plaintiff was entitled to them under the plan's terms. 126 S.Ct. at 1874. The Supreme Court thus observed that the restitution action at issue involved "a constructive trust or equitable lien on a specifically identified fund," and was therefore equitable in nature, and permissible under ERISA § 502(a)(3).

In the instant case, the funds have been identified to Rios's two bank accounts, from which he withdrew the funds to make mortgage payments on his house. The house and the accounts are both still in Rios's possession. Further, under section 9.8(g) of the Plan, the Trustees are granted the right to recover any erroneously made payments due to the failure of the participant to notify the Trustees of his re-employment. Accordingly, this Court grants the Trustees' request for an imposition of a constructive trust on Rios's bank accounts, as well as his house. Having granted the Trustees' request for relief on the fifth cause of action, the Court need not reach the Trustees' alternative claims for relief. Prejudgment interest is denied.

## VI.  CONCLUSION

Accordingly, judgment is entered in favor of the Trustees. Each side is to bear its own costs.

DATE:  October 4, 2009

STEPHEN G. LARSON
UNITED STATES DISTRICT JUDGE